724 So.2d 410 (1998)
Samuel A. BACOT; Rosella Bacot Gill; James W. Bacot; Imogene Bacot Fly, Individually and as Administratrix of the Estate of Evelyn Bacot; Frances Bacot, by and through James W. Bacot; and Gerald M. McMillan, Appellants,
v.
Marguerite B. DUBY; Marness Bacot (Marness Bacot Frye); Violet A. Bacot; Winston Duby; Donald R. Duby; Roger Richmond; David Richmond; Mary L. Bacot; John R. Bacot; Hilda Bacot Booty; Guardianship of Stacy Bacot, Nora Devine and Don Devine, Guardians; Guardianship of James Augustus Jones, III, Blanche Bacot Sanders, Guardian; Alfred E. Bacot; Susan P. Jolly; Alfred J. Duby; Carolyn D. Kyzer; Michael Duby; June V. Owen; Lynne Richmond; Delores Bacot Martin; Heather Bacot Jones Newton; Donna McCullough; Samuel Vaught Richmond; Edith Bacot Bowden; Eleanor Bacot Jones; Samuel A. Bacot, Jr.; David Michael Hyde as Personal Representative of the Estate of Eleanor V. Hyde; and Marion V. Gordon, Appellees.
No. 96-CA-00555 COA.
Court of Appeals of Mississippi.
November 24, 1998.
*411 Clyde Ratcliff, Gerald M. McMillan, McComb, Attorneys for Appellants.
H.B. Mayes McGehee, Meadville, T.F. Badon, Liberty, Attorneys for Appellees.
Before THOMAS, P.J., DIAZ, and HERRING, JJ.
HERRING, J., for the Court:
¶ 1. This appeal arises from a judgment rendered in the Chancery Court of Pike County, Mississippi, concerning certain real property originally acquired by Dr. and Mrs. William Bacot. Several heirs[1] of Dr. and Mrs. William Bacot[2] filed an action to partition the surface estate of 920 acres of property in Pike County, known and referred to as the "Bacot Place." In a motion for a declaratory judgment, the Appellees claimed an undivided one-seventh (1/7) surface interest in the property by virtue of the provisions of a will executed by Emma Bacot Jones, one of Dr. and Mrs. Bacot's seven children.
¶ 2. In response, the Appellants, the heirs of Dr. and Mrs. Bacot's son, Fred Bacot, also claimed ownership of Emma Bacot Jones's one-seventh (1/7) surface interest through a deed dated March 22, 1958, whereby Emma transferred her interest in the surface estate to her brother, Fred. The Appellants also alleged that a subsequent "Agreement" dated November 19, 1958, which was executed by Emma and all of the other surviving heirs of Dr. and Mrs. Bacot and purported to establish individual ownership interests of each heir in the Bacot Place, was not a conveyance of the surface estate at all, but rather, was intended to establish and reaffirm each heir's undivided mineral ownership interest in the Bacot Place.[3] Accordingly, the Appellants sought a reformation of the November 19, 1958, agreement on the grounds of (1) mutual mistake or scrivener's errors or; (2) alternatively, a determination that they had acquired *412 Emma Bacot Jones's one-seventh (1/7) surface interest by adverse possession.
¶ 3. Following a trial, the chancellor found that the heirs of Fred Bacot failed to establish that the November 19, 1958, agreement was executed by a mutual mistake by the parties or contained a scrivener's error. The court also held that the evidence presented by Fred's heirs failed to demonstrate that he acquired Emma's one-seventh (1/7) surface interest in the disputed property by adverse possession. In a "Final Decree", the chancellor declared that the devisees and descendants of devisees under Emma's will were the lawful owners of her surface interest in the property. It is from this judgment that the Appellants perfected an appeal to this Court. After reviewing the briefs of counsel, the record, and after listening to oral argument, we find that the chancellor did not abuse his discretion or commit manifest error in his findings of fact. Therefore, we affirm.

A. THE FACTS
¶ 4. Dr. William Bacot and Mrs. Myra Atkinson were married on January 28, 1857. The Bacots subsequently acquired title to 920 acres of real property in Pike County, Mississippi, upon which they built a family residence and reared their children. During the course of their marriage, the Bacots had ten children. Dr. Bacot died intestate on December 11, 1900, whereupon Fred, the youngest of the children, returned home from college to attend to his mother and the property. Mrs. Bacot died intestate in 1919, leaving seven surviving children who were as follows: Junius Laborn Bacot, Anna Moore Bacot Vaught, William Clinton Bacot, Ella Bacot Richmond, Myra Pet Bacot Varnado, Emma Bacot Jones, and Fred Bacot. Each child inherited an undivided one-seventh (1/7) interest in the Bacot Place.
¶ 5. Following the death of Mrs. Bacot, the seven children attempted to reach an agreement as to how the estate was to be divided and met in the home of Myra Pet Bacot Varnado to discuss the division. However, no agreement was ever reached.
¶ 6. An unsigned letter dated February 2, 1954, addressed to Rosa and Meyer Richmond (the daughter and son-in-law of Anna Bacot Vaught) circulated among various heirs. The letter acknowledged the efforts of Fred Bacot in residing upon, preserving, and making improvements to the Bacot Place, and an "Agreement" attached to the letter documented a desire to have Fred own all surface rights to the 920 acres. The attached agreement was signed only by Fred, Emma Bacot Jones, Rosa Vaught Richmond, William B. Richmond, and J. Harold Richmond. However, the agreement never went into effect because of the failure of all the heirs to execute the document.
¶ 7. With the consent of other family members, Fred continued to farm the property and live in the family home with his wife, Bessie, and their six children: Evelyn Bacot, Imogene Bacot Fly, James W. Bacot, Samuel Alfred Bacot, Rosella Bacot Gill, and Frances Bacot. Fred, on occasion, acted as if he were the sole owner of the property by selling timber and granting easements to various oil companies without the consent of his coowners. At other times, various family members would join in the execution of documents affecting title to the property. No other children of Dr. and Mrs. Bacot lived in the Bacot family home after the marriage of Fred and Bessie in 1906.
¶ 8. Upon Fred's death in 1962, his son, James, took over the management of the property, and Fred's daughter, Frances, currently resides in the Bacot family home. There has been no change in the status or use of the surface from any time between Mrs. Bacot's death in 1919 to the present day. No rental payments have ever been paid by Fred to the other Bacot heirs. In addition, neither Fred nor any of his descendants have ever paid a portion of the profits from the operation of the farm to any other members of the family. However, Fred and his descendants have always paid the ad valorem taxes on the property since Mrs. Bacot's death.

I. Documents Purporting to Transfer Additional Surface Interest to Fred Bacot

A. 1927 Document Executed by Junius Laborn Bacot
¶ 9. On January 26, 1927, Junius Laborn Bacot, Fred's brother, executed a document *413 which purportedly released his interest in the estate of his father and mother. The handwritten document did not explicitly convey Junius's interest to Fred. Rather, the document contained one sentence that recited: "For value received from my brother Fred Bacot and other considerations I hereby relinquish all claim of any of my mother and father's real estate and personal property."
¶ 10. Junius Laborn Bacot died intestate on January 20, 1928, leaving as his heirs his widow, Carrie, and seven children. On February 24, 1944, Fred filed the document in the land deed records of Pike County. The heirs of Junius Bacot testified that they never saw the document before the trial nor could they recall Fred ever telling any other member of the family about the document. All the heirs of Junius Bacot presumed that Junius owned an undivided one-seventh (1/7) interest in the Bacot Place at the time of his death.

B. 1958 Deed from Emma Bacot Jones
¶ 11. On March 22, 1958, Emma Bacot Jones executed a deed conveying to her brother, Fred Bacot, all of her undivided one-seventh (1/7) surface interest in the land comprising the Bacot Place but reserving unto herself all of the oil, gas, and other mineral rights to the property. The deed was prepared and notarized by the late O.W. Phillips, Fred's family attorney.

C. 1959 Deed from Rosa Vaught Richmond
¶ 12. Rosa Vaught Richmond, one of three children of Anna Moore Bacot Vaught, transferred her undivided one-twenty-first (1/21) interest in the surface of the Bacot Place to Fred by deed dated February 4, 1959. Following this transaction, Fred claimed to own a combined undivided ten-twenty-first (10/21) surface interest in the Bacot Place.

II. Oil Litigation Involving the Bacot Place
¶ 13. On January 31, 1958, Fred Bacot, Emma Bacot Jones, and other Bacot heirs executed an oil, gas, and mineral lease to Pioneer Oil and Gas Company, Incorporated, covering their mineral rights in all of the Bacot Place. The lease was filed on February 5, 1958. Thereafter, Fred Bacot, Emma Bacot Jones, and other Bacot heirs also executed an oil, gas, and mineral lease to Barnwell Production Company, covering all of their mineral rights in the Bacot Place. Although this lease was signed after the Pioneer lease, it was filed on February 3, 1958, two days before the Pioneer lease was recorded.
¶ 14. Pioneer filed suit to set aside the Barnwell lease on February 7, 1958, in the Chancery Court of Pike County, Mississippi, against Barnwell Production Company and the five heirs who signed both leases including, Fred Bacot and Emma Bacot Jones. The Bacot heirs were represented by attorney O.W. Phillips.
¶ 15. Pioneer and Barnwell entered an agreement on November 29, 1958, to settle the litigation by cross-assigning to each other one-half of the lease interests in the mineral acreage and by assigning mineral rights to the land in a checker-board pattern. The settlement agreement, signed by representatives of both Barnwell and Pioneer, recites, as evidence of the compromise, a November 19, 1958, agreement signed by all the heirs of Dr. and Mrs. William Bacot. The Bacot heirs and an attorney of record for Pioneer acknowledged that the issue in the litigation was a priority of oil, gas, and mineral leases to the Bacot Place and had nothing to do with surface ownership. None of the Bacot heirs were required to sign the Barnwell/Pioneer settlement agreement.

III. The November 19, 1958, Agreement
¶ 16. On November 19, 1958, all of the surviving children and descendants of deceased children of Dr. William and Myra Bacot, including Fred and Emma, executed a document entitled "Agreement." The document, drafted and notarized by O.W. Phillips, recites as follows:
This Agreement made and entered into this, the 19th day of November, 1958, by and between the undersigned parties, being all of the heirs of William Bacot and Myra C. Bacot, Deceased;
For and in consideration of the mutual benefits accruing, each to the other, and in *414 consideration of ONE AND NO/100 ($1.00) DOLLAR, cash in hand paid, each to the other, the undersigned parties do hereby agree that they and each of them are the owners of that certain land situate [sic] in Pike County, Mississippi, more particularly described as follows, to-wit:
W/2 and S/2 of NE/4 and NW/4 of NE/4 of Section 3, and E/2 and E/2 of NW/4 and NE/4 of SW/4 of Section 4, and NE/4 of NW/4 of Section 10, Township 4 North, Range 8 East,
in the following proportions, to-wit:

Willie C. Bacot ..................1/7th
Fred Bacot .......................1/7th
Mrs. Emma B. Jones ...............1/7th
Mrs. Rosa Vaught Richmond ........1/21st
Mrs. A.S. Coody ..................1/21st
William Edward Vaught ............1/21st
William B. Richmond ..............1/14th
J. Harold Richmond ...............1/14th
Mrs. Carrie Bacot ................1/56th
William A. Bacot .................1/56th
Mrs. Myra B. Voorhies ............1/56th
Mrs. Marguerite B. Derby .........1/56th
John J. Bacot ....................1/56th
Samuel A. Bacot ..................1/56th
Ritchie L. Bacot .................1/56th
Robert A. Bacot ..................1/56th
Hazel D. McDonald ................1/28th
Mrs. Joe D. Gordon ...............1/28th
Mrs. Eleanor Hyde ................1/28th
Janice Williams ..................1/28th

subject only to Oil, Gas and Mineral Leases executed by the undersigned parties as reflected by the records in the office of the Chancery Clerk of Pike County, Mississippi, and the undersigned parties hereto do hereby convey, each to the other, the respective interests in said land as above set forth.

Mrs. Bessie Bacot, wife of Fred Bacot, and Mrs. Myra P. Varnado, daughter of William Bacot and Myra C. Bacot, join in the execution of this agreement to evidence their consent hereto. (emphasis added).
¶ 17. Marion Gordon (Mrs. Joe D. Gordon), the only witness at the trial who signed the November 19, 1958, agreement, stated that O.W. Phillips said nothing to indicate that the document applied only to mineral ownership. She understood that the agreement had been prepared for execution by her and the other Bacot heirs in order for them to convey to each other their respective ownership interests in the Bacot Place.

IV. Events After the Execution of the November 19, 1958, Agreement

A. November 26, 1958, Deed from Heirs of Junius Laborn Bacot to Fred Bacot
¶ 18. Marness Bacot, the wife of John Junius Bacot, who was a son of Junius Laborn Bacot, testified that within days of the signing of the November 19, 1958, agreement, Samuel Bacot, Fred's son, visited her home in Baton Rouge, Louisiana. Samuel expressed concern that after the agreement was signed, Fred owned no more than a oneseventh (1/7) surface interest in the Bacot Place and questioned whether his father could earn an adequate living. He represented that all of the other heirs of Dr. and Mrs. Bacot had agreed to transfer their surface interests to Fred and asked for the heirs of Junius Laborn Bacot to do the same.
¶ 19. Shortly thereafter, the widow and seven children of Junius Laborn Bacot transferred their surface interests in the Bacot Place to Fred in a deed drafted and notarized by O.W. Phillips on November 26, 1958.

B. Letters and Documents from Oil Companies Regarding Surface Damages
¶ 20. From 1958 through 1963, Plymouth Oil and Pioneer Oil were permitted to drill on the Bacot Place. Before drilling commenced, the oil companies independently negotiated agreements with the surface owners for certain payments for damages to the surface of the Bacot Place resulting from the drilling. The legal documents were forwarded to the individuals whom the oil companies understood were the surface owners. Generally, the letters and legal documents indicated the damage amount and the percentage of ownership of each individual. The records and payments reveal that Fred and his heirs were paid damages for a ten-twenty-first (10/21) interest in the property. Emma was never recognized as a surface owner by the oil companies.
¶ 21. After Emma's death in 1969, payments continued. Fred's heirs continued to *415 receive payment on a ten-twenty-first (10/21) percentage interest basis; the residual beneficiaries to Emma's will were paid damages based upon their fractional interests without regard to any portion attributable to Emma. The oil companies never received any objection from Emma Bacot Jones or any of her residual beneficiaries regarding payment or ownership interest.

C. 1960 Affidavit of William C. Bacot and Myra P. Varnado
¶ 22. On September 2, 1960, William C. Bacot and Myra P. Varnado, two of Dr. and Mrs. Bacot's children, executed an affidavit in which they declared that they each inherited an undivided one-seventh (1/7) interest in the Bacot Place. The two heirs stated that they, along with the remaining heirs, permitted Fred and his family to continue to reside on the property rent free except for the payment of taxes subsequent to their mother's death. William and Myra also claimed that prior to and after their parents' death, they never: (1) agreed to partition the property; (2) agreed that Fred was entitled to any more than his one-seventh (1/7) interest in the property; (3) executed any documents to partition the property; or (4) agreed verbally that Fred was to have any portion of their interest in the property. Furthermore, William declared that he still owned an undivided one-seventh (1/7) interest, and Myra stated that she had conveyed her interest to her children and grandchildren. Finally, the two children asserted that they did not intend to convey any portion of their interest in the property to Fred and that any instruments or verbal agreements to the contrary were "forged, untrue or false."

D. Fred's Death and Estate Proceedings
¶ 23. Fred Bacot died on September 23, 1962. Imogene Bacot Fly, Fred's daughter, administered his estate with the assistance of O.W. Phillips. In correspondence written by Mr. Phillips to Fred's children, he represented Fred's ownership interest in the surface of the Bacot Place to be an undivided tentwenty-first (10/21) interest. During the course of the administration of Fred's estate, Mr. Phillips assisted in the preparation and filing of the Federal and Mississippi estate tax returns. Both returns reflect that Fred owned an undivided ten-twenty-first (10/21) interest in the surface of Bacot Place and a one-seventh (1/7) interest in the mineral rights. Emma Bacot Jones is shown only as owning a one-seventh (1/7) interest in the mineral rights.

E. Emma's Death and Estate Proceedings
¶ 24. Emma Bacot Jones died testate at the age of ninety-four on September 8, 1969. Joe D. Gordon, an attorney and the husband of Marion Gordon, administered her estate. While both the will and the inventory of the assets of her estate included royalty and mineral interest payments in regard to the Bacot Place, neither documents referenced any surface ownership by the decedent in the Bacot Place.[4]
¶ 25. Under the residuary clause of Emma's will which did not specifically mention the Bacot Place, any remaining property Emma owned at the time of her death was devised to eighteen named individuals. Several of the eighteen residuary beneficiaries, including J. Harold Richmond, Janice Williams, John Junius Bacot, and Ralph Clinton Bacot, Jr., have since died. None of the deceased beneficiaries acknowledged in their wills any surface rights to the Bacot Place acquired through the Last Will and Testament of Emma Bacot Jones. In addition, no such interests were included in the inventories of their estates.

6. Commencement of Litigation
¶ 26. On June 30, 1992, an action was filed by some of the heirs of Dr. and Mrs. Bacot, to partition the surface estate of the Bacot Place. The complaint reflects that Emma Bacot Jones inherited from her parents an undivided one-seventh (1/7) interest in the Bacot Place, which she still owned at the time of her death and devised to eighteen *416 individuals through the residuary clause of her last will and testament.
¶ 27. In September 1992, a timber consultant inspected the land and found a significant infestation of southern pine beetles on a portion of the property. An order granting emergency relief and authority to sell the timber was issued by the Chancery Court of Pike County, Mississippi. The sale of the timber produced $1,623,706 in proceeds. In a "Motion for Determination of Ownership for Partial Distribution" of the proceeds from the timber sale, the following was alleged by the heirs of Fred Bacot:
The issue has been raised as to whether or not, at the time of her death, Emma Bacot Jones owned 1/7 of the "the property" or only 1/7 of the minerals which were reserved in her conveyance to Fred Bacot. The heirs-at-law of Fred Bacot claim that the devisees under the last Will and testament of Emma Bacot Jones above described own no interest in the surface, the additional 1/7 being the property of the heirs of Fred Bacot.
¶ 28. The chancery court subsequently determined that there was no dispute over the ownership interest of six-sevenths (6/7) of the surface estate in the Bacot Place, and the court authorized a partial distribution of the proceeds from the timber sale to the undisputed owners of the six-sevenths (6/7) interest. The remainder of the proceeds were placed in an escrow account pending the resolution of the contested ownership in the one-seventh (1/7) interest.
¶ 29. On July 25, 1994, the devisees and descendants of devisees named in the will of Emma Bacot Jones, Appellees, filed a motion for a declaratory judgment pursuant to Rule 57 of the Mississippi Rules of Civil Procedure. The Appellees asserted ownership of a one-seventh (1/7) interest in the Bacot Place by the agreement and conveyance dated November 19, 1958, and by the will of Emma Bacot Jones. The Appellants, the heirs of Fred Bacot, asserted that the November 19, 1958, agreement was intended only to establish and reaffirm the various ownership interests in the mineral rights of the Bacot Place, and they counterclaimed for "Reformation of Written Instrument to Conform to Intent of Parties and/or to Correct Scriveners Error and Other Relief." The Appellants subsequently amended their counterclaim to alternatively request that the trial court determine that they owned the contested oneseventh (1/7) surface interest by adverse possession.

B. THE TRIAL
¶ 30. The chancellor entered a final judgment on May 7, 1993, in which he concluded that: (1) the agreement dated November 19, 1958, was clear; and established the interest and mutually conveyed to each child or descendants of children in the Bacot family the undivided interest specified in the agreement; (2) the Appellants (the heirs of Fred Bacot) failed to meet the burden of proof required of them to show that the November 19, 1958, agreement was the result of a mutual mistake among the parties or resulted from an error on the part of the scrivener; and (3) the Appellants failed to meet the burden imposed upon them to show that Emma Bacot Jones had notice of a claim by adverse possession or notice by conduct equivalent to notice.

C. THE ISSUES
¶ 31. The Appellants appeal and assert the following assignments of error which are taken verbatim from their brief:
I. THE LEARNED CHANCELLOR COMMITTED MANIFEST ERROR IN FAILING TO REFORM THE NOVEMBER 19, 1958, AGREEMENT.
II. THE LEARNED CHANCELLOR MANIFESTLY ERRED IN FAILING TO GRANT ALTERNATIVE RELIEF BY FINDING ADVERSE POSSESSION BY FRED BACOT AND HIS HEIRS TO EMMA B. JONES' SURFACE RIGHTS TO BACOT PLACE.

D. ANALYSIS
¶ 32. We will address each of these issues in sequence:

I. DID THE CHANCELLOR ERR IN FAILING TO REFORM THE NOVEMBER 19, 1958, AGREEMENT?
*417 ¶ 33. The heirs of Fred Bacot contend that the November 19, 1958, agreement inaccurately reflects the intentions of the parties. They assert that the purpose of the 1958 agreement was to assign each individual's mineral interest in the property rather than that person's respective surface ownership interest. Based on this alleged error, the Appellants argue that the chancellor should have reformed the agreement to reflect the true intentions of the parties.
¶ 34. An appellate court employs a limited standard of review on appeals from the chancery court. Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997). We will not disturb the findings of the chancellor unless he was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Goode v. Village of Woodgreen Homeowners, 662 So.2d 1064, 1070 (Miss. 1995).
¶ 35. In an action to reform a deed, the Mississippi Supreme Court has held that the party asserting reformation must prove (1) a mistake on the part of both parties; or (2) a mistake on the part of one party with fraud or inequitable conduct on the part of the other party; or (3) an error on the part of the scrivener. Perrien v. Mapp, 374 So.2d 794, 796 (Miss.1979); Veterans Admin. v. Bullock, 254 Miss. 562, 569-70, 180 So.2d 610, 614 (1965). Moreover, the mistake must be proven beyond a reasonable doubt. McCoy v. McCoy, 611 So.2d 957, 961 (Miss.1992).
¶ 36. A review of the November 19, 1958, agreement reveals that its language is clear and unambiguous and that it conveys both surface and mineral interests in the Bacot Place to the various parties in interest. The agreement states: "[T]he undersigned parties do hereby convey, each to the other, the respective interests in said land as above set forth." (emphasis added). As stated in the agreement, this conveyance was "subject only to Oil, Gas and Mineral Leases executed by the undersigned parties as reflected by the records in the office of the Chancery Clerk of Pike County, Mississippi." Thus, the definition of the word "land" in the agreement (and the intent of the parties in using the word "land") is important.
¶ 37. The term "land" normally encompasses both surface and mineral interests in real property. The supreme court addressed the meaning of the term "land" in the early case of Harrell v. Miller, 35 Miss. 700 (1858). In that case, the court considered whether an oral agreement for the sale of growing timber was a contract for the sale of lands within the purview of the statute of frauds. Id. at 701. The court noted that while many reported decisions held that growing trees were mere chattels, several other cases found the timber to be a parcel of the land. Id. In resolving the divergence of opinions, the court concluded that "[t]he term land, embraces not only the soil, but its natural produce growing upon and affixed to it. Such things, being the natural product of the land, are part and parcel of it, and therefore, pass by a grant of the land." Id. See also Whelan v. Johnston, 192 Miss. 673, 685, 6 So.2d 300, 303 (1942) ("[T]he term `land' embraces both its soil and minerals, and a conveyance of land, without more, includes both."); 73 C.J.S. Property § 17(b) (1983) ("[Land] includes not only the face of the earth but everything under it or over it, and has in its legal significance an indefinite extent upward and downward.").
¶ 38. There is no indication on the face of the November 19, 1958, agreement that the term "land" was intended to distinguish between mineral or surface rights. Consequently, we find that the agreement conveyed both the surface and mineral interests in the Bacot Place subject to the previously executed leases on the property. Still, the evidence of the intent of the parties when they executed the instrument is conflicting.
¶ 39. The omission of a surface real estate interest in a considerably detailed will, notwithstanding the residuary clause; a similar omission in the inventory filed in Emma Bacot Jones's estate; and the similar omission by the various residual beneficiaries of Emma's estate suggests the possibility of a mistake by those who executed the November, 1958, agreement. Additionally, the absence of an assertion of surface ownership by Emma when payments were made by the oil companies to the surface owners creates an argument for reformation, especially since *418 Emma lived next door to two siblings who regularly received such payments.
¶ 40. On the other hand, Fred Bacot did accept a deed conveying surface rights to the premises from the heirs of Junius Laborn Bacot after the signing of the November 19, 1958, agreement despite the existence of the January 26, 1927, deed purporting to transfer the same interest to Fred. It is noteworthy that Marness Bacot, the wife of John Junius Bacot, testified that shortly after the execution of the 1958 agreement, Fred's son, Samuel, visited her family in Baton Rouge, Louisiana. According to Marness Bacot, Samuel expressed concern that after the agreement was signed, his father only owned an undivided one-seventh (1/7) interest in the Bacot Place. Mrs. Bacot also stated that Samuel questioned whether his father would be able to earn a livelihood from that small portion of the property. After Samuel informed Mrs. Bacot that all of the other heirs were going to convey their surface interests to his father, Mrs. Bacot testified that she and her seven children agreed to release their oneseventh (1/7) interest to Fred. Thereafter, on November 26, 1958, Mrs. Bacot and her children executed a quitclaim deed and conveyed their surface interest to Fred.
¶ 41. Moreover, Marion Gordon (Mrs. Joe D. Gordon), the only witness to testify who actually signed the November 1958 agreement, said that there were no discussions or comments made by any of the parties or the attorney who prepared the document to indicate that the agreement was to apply only to mineral interests. Several other witnesses, including Martha Gerald,[5] who represented Pioneer Oil during the litigation with Barnwell Oil, testified that the dispute between the two oil companies in 1958 did not concern any individual's ownership interest in the minerals or surface rights of the Bacot Place. Rather, the litigation revolved around a priority of leases.
¶ 42. On several occasions, Fred Bacot granted rights-of-way to various oil companies across the Bacot Place without the consent of the other property owners. In one instance, a title company hired by Shell Pipeline Corporation to research the ownership of the Bacot Place during the acquisition of a right-of-way in 1984, advised the corporation of the November 19, 1958, agreement. While the title company stated that Fred Bacot appeared to own a ten-twenty-first (10/21) interest in the property, the company specifically noted that the research was subject to several limitations, including the 1958 agreement. Jon Krause, an attorney and a Shell right-of-way supervisor on the project, testified through deposition that he imagined that the agreement caused him some concern back then. However, Mr. Krause stated that the agreement "appeared to be after the fact of a valid conveyance" and therefore, he ignored the agreement in determining whether Emma Bacot Jones had an interest in the property and should have been paid for any interest that she might have in the right-ofway.
¶ 43. As noted above, this Court applies a limited standard of review on appeals from chancery court, and we will not disturb findings of the chancellor "unless the chancellor was manifestly wrong, clearly erroneous or applied an erroneous legal standard." Goode v. Village of Woodgreen Homeowners, Ass'n, 662 So.2d 1064, 1070 (Miss.1995). As noted, Fred's heirs were required to establish before the chancellor a mutual mistake among the parties beyond a reasonable doubt. McCoy, 611 So.2d at 961. Based upon the evidence before us, we cannot find that the chancellor committed a manifest error in ruling that they failed to do so, although the evidence is conflicting on the intent of the parties when they executed the 1958 agreement. We therefore affirm his finding that the evidence failed to establish a mistake beyond a reasonable doubt.

II. DID THE CHANCELLOR ERR IN FAILING TO GRANT ALTERNATIVE RELIEF BY FINDING ADVERSE POSSESSION BY FRED BACOT AND HIS HEIRS TO EMMA B. JONES'S SURFACE RIGHTS TO BACOT PLACE?
*419 ¶ 44. The question of whether adverse possession was proven by clear and convincing evidence is also a factual determination to be made by the chancellor. As stated above, our review of such findings on appeal is limited by the "substantial evidence/manifest error standard of review." West v. Brewer, 579 So.2d 1261, 1264 (Miss.1991). This Court will overturn a chancellor's determination only if he is "manifestly wrong or clearly erroneous, or an erroneous legal standard was applied." Jordon v. Warren, 602 So.2d 809, 812 (Miss.1992).
¶ 45. Mississippi Code Annotated Section 15-1-13 (Rev.1995) defines adverse possession as follows:
Ten years' actual possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title...
¶ 46. Under Mississippi case law, the party claiming adverse possession has the burden of proving by clear and convincing evidence that his possession or occupancy of the property was: (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful. Blankinship v. Payton, 605 So.2d 817, 819 (Miss.1992); Rice v. Pritchard, 611 So.2d 869, 871 (Miss. 1992).
¶ 47. Furthermore, in a case involving a claim of adverse possession where the party holds the property with co-tenants, the burden of proof is even greater. Jordon v. Warren, 602 So.2d 809, 815 (Miss.1992). The supreme court stated:
An ouster of a cotenant not in possession must be unequivocal notice of some kind to the cotenant not in possession that the one in possession intends to hold and claim ownership of the property to the exclusion of all others. The cotenant in possession must effect an ouster of an unequivocal nature and distinctly hostile to the rights of the others so that the intent to possess adversely is clear and unmistakable.
The cotenant alleging ouster has the burden of establishing that the other cotenants were unequivocally ousted by actual notice or conduct equivalent thereto. Evidence of acts by the cotenant not inconsistent with cotenancy, such as using the land and paying taxes on it, do not constitute an ouster of the other co-tenants. An ouster cannot be proved merely by acts which are consistent with an honest intent to acknowledge the rights of the cotenant. The evidence of knowledge of an ouster must be clear and convincing.
Id. (citations omitted).
¶ 48. We cannot conclude that the acts of ownership performed by the Appellants were the equivalent of actual notice because the use was not inconsistent with their interest as co-tenants. Further, James Bacot, Fred's son, offered the only testimony of any conversations between the two parties pertaining to the Appellant's intent to adversely possess Emma Bacot Jones's oneseventh interest. When asked if he and his siblings ever asserted ownership of Emma's one-seventh interest, he recalled one conversation with his father in the presence of Marion Gordon regarding recently cut timber in which he stated, "Dad, you got Aunt Emma's part and you are doing good." This conversation allegedly refers to the March, 1958, deed where Emma conveyed her surface interest in the Bacot Place to her brother, Fred.
¶ 49. The only additional evidence of notice of ouster is the acceptance of payments from the oil companies for surface damage on a ten-twenty-first interest by Fred and his heirs. This cannot constitute "unequivocal" notice of an adverse claim on the property. To allow the Appellants to acquire one of their cotenant's interest with such passivity is inconsistent with the requirement of "unequivocal" notice, particularly in light of the family's confusion as to the ownership interest in the land as evidenced by the institution of this action and the testimony of the parties. It is also noteworthy that the Appellants claimed that Fred's actions only adversely possessed Emma's one-seventh (1/7) *420 surface interest and not the remaining property interests owned by the other Bacot heirs, even though Fred worked and paid taxes on the entire land in question for many years and cut and sold timber on the premises without the consent of the other descendants.
¶ 50. In sum, conflicting testimony exists. "The credibility of witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as trier of facts." Brewer, 579 So.2d at 1263-64 (quoting Polk v. Polk, 559 So.2d 1048, 1049 (Miss.1990)). As such, this Court will not disturb the credibility assessments and the findings of the chancellor.
¶ 51. We therefore affirm the judgment of the chancery court.
¶ 52. THE JUDGMENT OF THE CHANCERY COURT OF PIKE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANTS.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., COLEMAN, DIAZ, HINKEBEIN, KING, PAYNE, and SOUTHWICK, JJ., CONCUR.
NOTES
[1] We will refer to the children and grandchildren of Dr. and Mrs. Bacot collectively as the Bacot heirs. Although the record reveals that Dr. and Mrs. Bacot died intestate, the record does not indicate whether each of their children who have since passed away died without the benefit of a will. Therefore, we are unable to ascertain if all of the descendants are testamentary beneficiaries or heirs.
[2] A "family tree" is attached to this opinion to avoid confusion concerning the relationships among the various individuals involved in this action.
[3] The Agreement recited that Emma was the owner of a one-seventh (1/7) interest in the land.
[4] Although real property is frequently omitted from an estate inventory, the inventory in this case did include two residences owned by Emma Bacot Jones.
[5] The testimony of Ms. Gerald, deceased, was read and introduced into evidence through a deposition taken in November, 1995.